# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 12, 2015        Decided August 4, 2015

No. 13-7103

CHEVRON CORPORATION AND TEXACO PETROLEUM COMPANY,
APPELLEES

v.

THE REPUBLIC OF ECUADOR,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01247)

---

*Mark N. Bravin* argued the cause for appellant. With him on the briefs were *Eric M. Goldstein* and *Eric T. Werlinger*.

*Jeffrey S. Bucholtz* argued the cause for appellees. With him on the brief were *Brian Callanan*, *James P. Sullivan*, *Brian A. White*, and *Caline Mouawad*.

Before: GARLAND, *Chief Judge*, and SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:

For the last twenty years, the Republic of Ecuador and energy industry giant Chevron Corporation have been locked in a struggle involving a series of lawsuits related to an investment and development agreement. The dispute began in the Ecuadorian court system, where it languished unresolved for over a decade. It then proceeded to an international arbitration tribunal, whose verdict in Chevron's favor was appealed and sustained at all levels of the Dutch judiciary. The dispute made it to our shores in an action for confirmation of the arbitral award before the District Court for the District of Columbia. The District Court confirmed the arbitral award, prompting yet another appeal. We now affirm.

## I.

In 1973, Chevron[1] and Ecuador signed an agreement allowing Chevron to develop Ecuadorian oil fields in exchange for providing below-market oil to the Ecuadorian government for domestic use. The deal was set to expire in 1992, and the parties were unable to agree to an extension. As the expiration date approached, Chevron filed several breach of contract suits against Ecuador. In 1995, Chevron and Ecuador signed a settlement agreement conclusively terminating all rights and obligations between the parties. The agreement provided for the continuation of the pending lawsuits.

In 1993, the United States and Ecuador signed a Bilateral Investment Treaty ("BIT")—formally known as the Treaty

---

[1] For purposes of this opinion, "Chevron" refers both to the Chevron Corporation and to its predecessor, Texaco Petroleum Co.

Between the Government of the United States of America and the Government of the Republic of Ecuador for the Encouragement and Reciprocal Protection of Investment—which took effect in 1997. Under this treaty, Ecuador made a standing offer to American investors to arbitrate disputes involving investments that existed on or after the treaty's effective date. J.A. 297, 300. For purposes of the BIT, the definition of "investment" included "a claim to money or a claim to performance having economic value, and associated with an investment." J.A. 294.

In 2006, Chevron commenced an international arbitration action before a three-member tribunal based out of The Hague, claiming that Ecuador had violated the BIT by failing to resolve its lawsuits in a timely fashion. Ecuador objected to the tribunal's jurisdiction, arguing that it had never agreed to arbitrate with Chevron. The basis of this objection was Ecuador's contention that Chevron's investments in Ecuador had terminated no later than 1995, two years prior to the entry into force of the BIT. The tribunal rejected the jurisdictional challenge, finding that Chevron's lawsuits were "investments" within the meaning of the BIT, and, after determining that Ecuador had delayed disposition of the lawsuits, ultimately decided against Ecuador on the majority of the breach of contract claims, awarding Chevron approximately $96 million. Ecuador challenged the award in the Dutch court system; the challenge was rejected by the District Court of The Hague, The Hague Court of Appeal, and the Dutch Supreme Court.

On July 27, 2012, Chevron petitioned the District Court to confirm the arbitral award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), which has been incorporated into the Federal Arbitration Act. *See* 9 U.S.C. §§ 201-208.

Ecuador raised three arguments in opposition: (1) that the District Court lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"); (2) that confirmation should be denied under the New York Convention; and (3) that a stay should be granted until the Dutch Supreme Court could resolve the then-pending appeal of the award.

The District Court determined that it had subject-matter jurisdiction under 28 U.S.C. § 1605(a)(6), which provides that sovereign immunity does not prevent a suit to confirm an award made pursuant to an arbitration agreement governed by an international treaty, because the award was made pursuant to the BIT and governed by the New York Convention. J.A. 1427-28. The District Court rejected Ecuador's argument that the FSIA required the District Court to undertake a de novo analysis of whether the dispute was arbitrable under the BIT. J.A. 1428-29. The District Court reviewed the question of arbitrability, however, as part of its consideration of whether the confirmation should be denied under the New York Convention, J.A. 1430-45, and found that the parties had "clearly and unmistakably agreed" that the tribunal would resolve such questions. J.A. 1436. Having made this finding, the District Court engaged in a deferential review of the tribunal's arbitrability decision and determined that it was clearly supported by the text of the BIT. J.A. 1439. The District Court rejected Ecuador's argument that confirming the order was against public policy and denied the requested stay. J.A. 1439-46. Ecuador filed a timely appeal. We affirm.

## II.

As a general matter, the FSIA grants foreign states immunity from the jurisdiction of the courts of the United

States. 28 U.S.C. § 1604. In enacting the FSIA, however, Congress enumerated several exceptions to this jurisdictional restriction. These exceptions "provide[] the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488-89 (1983). At issue in this case is the arbitration exception, which provides for federal court jurisdiction "in any case . . . in which the action is brought, either to enforce an [arbitration] agreement made by the foreign state with or for the benefit of a private party . . . or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty . . . in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6).

The District Court concluded that the jurisdictional requirements of the FSIA were met because "the Award's own language indicates it was rendered pursuant to the BIT" and "the Award is clearly governed by the New York Convention." *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 62 (D.D.C. 2013). Ecuador argues that the District Court failed to determine in the first instance that an arbitration agreement existed, instead deferring to the judgment of the arbitrator. Had the District Court undertaken the correct analysis, the argument goes, it would have determined that Ecuador had never agreed to arbitrate its dispute with Chevron, thus denying the District Court jurisdiction to enforce the arbitral award. Chevron primarily argues that the statute permits jurisdiction so long as the plaintiff presents a non-frivolous claim that the foreign sovereign has consented to arbitration.

**A.**

There are two types of jurisdictional authorizations: (1) "jurisdiction [that] depends on particular factual propositions" and (2) "jurisdiction [that] depends on the plaintiff's asserting a particular type of claim." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008). Ecuador argues that the § 1605(a)(6) exception requires the District Court to make three findings: "(1) a foreign state has agreed to arbitrate; (2) there is an award based on that agreement; and (3) the award is governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards." Appellant's Br. at 23. Chevron argues that the exception allows jurisdiction any time a plaintiff asserts a non-frivolous claim involving an arbitration award. Appellee's Br. at 30-31.

For the most part, Ecuador has the better argument, and has identified the relevant jurisdictional facts. In most instances, the existence of an arbitration agreement is a "purely factual predicate[] independent of the plaintiff's claim." *Chabad*, 528 F.3d at 940. Likewise, the existence of an award is a factual question that the District Court must resolve in order to maintain jurisdiction. If there is no arbitration agreement or no award to enforce, the District Court lacks jurisdiction over the foreign state and the action must be dismissed.[2]

---

[2] The statute does not require that the District Court determine that the award is governed by a treaty; if the first two jurisdictional facts are established, the District Court has jurisdiction so long as the award "is *or may be* governed by a treaty." 28 U.S.C. § 1605(a)(6) (emphasis added). This element of the jurisdictional authorization is thus closer to the claim-based jurisdictional test proposed by Chevron. The distinction is irrelevant for purposes of this case, as

As the plaintiff, Chevron bears the initial burden of supporting its claim that the FSIA exception applies. *See id.* "[T]his is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Id.* Chevron has met its burden of production by producing the BIT, Chevron's notice of arbitration against Ecuador, and the tribunal's arbitration decision. Ecuador does not dispute the existence of the BIT, Chevron's notice, or the tribunal's arbitration decision, but instead challenges the District Court's conclusion that the BIT (or the combination of the BIT and Chevron's notice of arbitration) is an arbitration agreement between Ecuador and Chevron.

**B.**

Ecuador argues that the FSIA required the District Court to make a *de novo* determination of whether Ecuador's offer to arbitrate in the BIT encompassed Chevron's breach of contract claims. According to Ecuador, if Chevron's claims are not covered by the BIT, then Ecuador never agreed to arbitrate with Chevron, and the District Court consequently lacked jurisdiction. In Ecuador's view, the arbitrability question is therefore a jurisdictional question that must be addressed by the District Court.

Ecuador conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention. For FSIA purposes, Chevron made a prima facie showing that there was an arbitration agreement by producing the BIT and

---

the parties do not dispute that the New York Convention governs arbitral awards issued pursuant to the BIT.

the notice of arbitration. Once Chevron made this showing, the burden shifted to Ecuador to demonstrate by a preponderance of the evidence that the BIT and the notice to arbitrate did not constitute a valid arbitration agreement between the parties. *Cf. Chabad*, 528 F.3d at 940. The jurisdictional task before the District Court was to determine whether Ecuador had sufficiently rebutted the presumption that the BIT and Chevron's notice of arbitration constituted an agreement to arbitrate.[3]

The Supreme Court's recent decision in *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014), is instructive on this point. In *BG Group*, Argentina's primary argument was similar to Ecuador's in the present case. By its terms, the Bilateral Investment Treaty between the United Kingdom and Argentina required an investor to litigate its claims in the local court system before submitting the claims to arbitration. 134 S. Ct. at 1204. BG Group submitted a claim to arbitration without observing this process. The arbitration panel concluded that Argentina had waived the local litigation requirement and found in BG Group's favor on the merits. *Id.* at 1204-05. When BG Group sought to confirm the award in the District Court for the District of Columbia, the District Court deferred to the arbitrators'

---

[3] The District Court eschewed making this determination as part of its jurisdictional analysis. This was error. The statute requires the District Court to satisfy itself that the party challenging immunity has presented prima facie evidence of an agreement between the parties and that the sovereign asserting immunity has failed to sufficiently rebut that evidence. There is no need to remand, however, because the District Court elsewhere found that the BIT and the notice of arbitration together constituted an agreement between the parties. *See Chevron*, 949 F. Supp. 2d at 63 ("The Court thus finds [Chevron] had a valid agreement to arbitrate under the BIT.").

determination regarding the local litigation requirement. *Republic of Argentina v. BG Group PLC*, 715 F. Supp. 2d 108, 121-22 (D.D.C. 2010). This Court reversed, holding that "[b]ecause the Treaty provides that a precondition to arbitration of an investor's claim is an initial resort to a contracting party's court . . . the question of arbitrability is an independent question of law for the court to decide." *Republic of Argentina v. BG Group PLC*, 665 F.3d 1363, 1371 (D.C. Cir. 2012).

The Supreme Court reversed. The Court "treat[ed] the document . . . as if it were an ordinary contract between private parties"—Argentina and BG Group—and concluded that the parties had intended to allow the arbitrator to determine whether the local litigation requirement had been satisfied. *BG Group*, 134 S. Ct. at 1206 (majority op.). In doing so, the Court implicitly rejected Argentina's contention that its offer to arbitrate only applied to investors who complied with the local litigation requirement. As the Chief Justice noted in his dissent, "[t]he majority opinion nowhere explains when and how Argentina agreed *with BG Group* to submit to arbitration. Instead, the majority seems to assume that, in agreeing with the United Kingdom to adopt [the arbitration provision] along with the rest of the treaty, Argentina thereby formed an agreement with all potential U.K. investors . . . to submit all investment-related disputes to arbitration." *BG Group*, 134 S. Ct. at 1216 (Roberts, C.J., dissenting).

While we are mindful of the Chief Justice's concerns, we agree with his interpretation of the Court's opinion. The BIT includes a standing offer to all potential U.S. investors to arbitrate investment disputes, which Chevron accepted in the manner required by the treaty. The FSIA therefore allows federal courts to exercise jurisdiction over Ecuador in order to

consider an action to confirm or enforce the award. The dispute over whether the lawsuits were "investments" for purposes of the treaty is properly considered as part of review under the New York Convention.

## C.

Even were we to conclude that the FSIA required a *de novo* determination of arbitrability, however, we would still find that the District Court had jurisdiction. In order to prevail on its jurisdictional argument, Ecuador would have to demonstrate by a preponderance of the evidence that Chevron's suits were not "investments" within the meaning of the BIT. This Ecuador has failed to do.

For purposes of the BIT, "'investment' means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party . . . and includes . . . a claim to money or a claim to performance having economic value, and associated with an investment." BIT Article I.1(a)(iii), J.A. 294. Ecuador argues that the final phrase – "and associated with an investment" – means that a lawsuit must be associated with an investment that existed within the effective period of the BIT in order to qualify as an investment under the BIT. This is a misreading of the treaty terms for two reasons.

First, Article I.3 provides that "[a]ny alteration of the form in which assets are invested or reinvested shall not affect their character as investment." In conjunction with the BIT's non-exhaustive definition of "investment," Article I.3 suggests that an investment continues to exist until it has been fully wound up and all claims have been settled. Chevron's lawsuits were therefore continuations of its initial investment in Ecuador and protected by the BIT.

Second, Article XII limits the application of the BIT "to investments existing at the time of entry into force as well as to investments made or acquired thereafter." J.A. 300. The investments referred to by this article are investments as defined in Article I, and include "a claim to money or a claim to performance having economic value, and associated with an investment." J.A. 294. Ecuador argues that the Article XII temporal limitation applies both to the claim and to the investment with which that claim is associated. We disagree. In our view, Article XII applies only to "investments" as defined by Article I, and *not* to the use of the term "investments" within the definitional paragraph. A lawsuit that existed at the time of entry into force of the BIT is consequently an "investment" for BIT purposes so long as that lawsuit is associated with an investment as generally defined: "An expenditure to acquire property or assets in order to produce revenue; the asset so acquired." BLACK'S LAW DICTIONARY (6th ed. 1990). Chevron's breach of contract lawsuits indisputably were associated with its pre-BIT investment activities, and the lawsuits indisputably existed when the BIT entered into force. The lawsuits themselves were therefore "investments" within the meaning of the treaty.

The District Court correctly determined that the BIT and Chevron's notice to arbitrate satisfied the jurisdictional requirements of the FSIA. Even if the FSIA required the *de novo* review of arbitrability suggested by Ecuador, however, the District Court would still have properly exercised jurisdiction because Ecuador failed to demonstrate by a preponderance of the evidence that Chevron's lawsuits were not protected by the BIT.

**III.**

Ecuador's arguments against confirmation of the award under the New York Convention are largely coextensive with its arguments related to the District Court's jurisdiction. There is no merit to these arguments, and the District Court properly confirmed the award.

As recognized by the court below, "the [New York Convention] affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012); *see also* Appellee's Brief Add. 3 (New York Convention provision setting forth exclusive grounds on which enforcement of an award may be refused). Ecuador asserts two grounds on which confirmation of the award should be denied: Articles V(1)(c) and V(2)(b) of the New York Convention. Article V(1)(c) provides that an award may be refused if it "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration," and V(2)(b) allows refusal if "the recognition or enforcement of the award would be contrary to the public policy" of the country in which enforcement is sought.

Ecuador's reliance on Article V(1)(c) is misplaced. The District Court did not need to reach the question of whether Chevron's lawsuits fell within the terms of submission to arbitration because the BIT allows the arbitration tribunal to make that determination. As discussed *supra*, the Supreme Court has analyzed a similar bilateral investment treaty as if it were a contract between the sovereign and the investor corporation seeking to confirm an arbitral award. "Where ordinary contracts are at issue, it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide. If the contract is silent on

the matter . . . courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability.'" *BG Group*, 134 S. Ct. at 1206 (internal citations omitted). The BIT is not silent on who decides arbitrability. Article VI of the BIT provides that the investor company may submit a matter to arbitration "in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)." BIT Art. VI(3)(a)(iii), J.A. 298. Under these rules, which the BIT incorporates by reference, "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause," and "shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part." UNCITRAL Arbitration Rules, G.A. Res. 31/91 art. 21 (Dec. 15, 1976). Ecuador therefore consented to allow the arbitral tribunal to decide issues of arbitrability—including whether Chevron had "investments" within the meaning of the treaty. *See also Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1077 (9th Cir. 2013) ("Incorporation of the UNCITRAL arbitration rules . . . constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 72 (2d Cir. 2012) ("[A] bilateral investment treaty's incorporation of the . . . UNCITRAL rules [is] clear and unmistakable evidence that the parties intended questions of arbitrability to be decided by the arbitral panel in the first instance.") (internal quotation marks omitted). There was no need for the District Court to independently determine that Chevron's suits satisfied the BIT's parameters once it had concluded that the parties had delegated this task to the arbitrator.

Ecuador's Article V(2)(b) arguments are similarly rooted in the "erroneous premise" that the BIT does not apply. *See*

Appellant's Br. at 55-56 ("Finally, the District Court erred by failing to deny confirmation on public-policy grounds. At the root of its incorrect analysis was the erroneous premise that the Republic and Chevron agreed to arbitrate."). Relying on this premise, Ecuador identifies two aspects of American public policy that are purportedly inconsistent with confirmation of the award. First, Ecuador argues that "the Award is repugnant to the policy that forum-selection clauses in agreements between sophisticated parties will be upheld" because Chevron and Ecuador had contractually agreed that Chevron's claims would be litigated in Ecuadorian courts. Appellant's Br. at 57-58. Second, Ecuador argues that confirmation is inconsistent with respect for foreign sovereignty, claiming that "the Tribunal effectively usurped the jurisdictional authority of the Ecuadorian judiciary, the only adjudicative body authorized to hale the Republic into court to respond to Chevron's lawsuits." Appellant's Br. at 58.

The primary flaw with the first argument is that it misapprehends the nature of Chevron's action. Chevron's breach of contract claims were brought in Ecuadorian courts, as required by the initial investment agreement and ratified by the 1995 settlement agreement.[4] Chevron's arbitration action alleged that Ecuador had unduly delayed resolution of those

---

[4] As Chevron notes, the 1995 settlement agreement did not expressly indicate that the claims would remain in Ecuadorian courts: "Any and all claims, of any type . . . which are separate from this agreement and which exist judicially between the parties, shall continue to be heard before the authorities having the appropriate jurisdiction." J.A. 182. While the use of the word "continue" indicates that the claims were to remain in Ecuadorian courts (where they were at the time of the settlement agreement), the language does not plainly foreclose proceedings before other authorities.

claims in violation of the BIT. J.A. 813-14. The issue initially before the arbitration panel was not whether Ecuador had breached its contract with Chevron, but instead whether Ecuador had breached the BIT by failing to resolve the contract suits in a timely fashion. In signing the BIT, Ecuador agreed to arbitration of precisely this type of action. *See* Art. II(7), J.A. 297 ("Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.").

A similar consideration forecloses Ecuador's claim of jurisdictional usurpation. The Tribunal did not usurp the authority of the Ecuadorian judiciary; Ecuador ceded that authority, first by signing the BIT, and then by failing to resolve Chevron's legal actions in a timely fashion.

Contrary to Ecuador's protestations, enforcement of the arbitral award is fully consistent with the public policy of the United States, most notably the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). By signing the BIT, Ecuador agreed to allow independent and neutral arbitrators to determine whether an investor company could take advantage of the substantive and procedural protections in the BIT. Chevron followed the proper procedure to request arbitration under the BIT, and the arbitrator determined that it had jurisdiction. Four courts have also considered and rejected Ecuador's argument that Chevron did not have the right to avail itself of the BIT's arbitration clause. Ecuador has given us no reason to conclude that these many authorities ruled in error.

## IV.

For the foregoing reasons, we affirm the District Court's confirmation of the arbitral award to Chevron.

*So ordered.*