# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 18, 2024          Decided August 5, 2025

No. 23-7174

HULLEY ENTERPRISES LTD., ET AL.,
APPELLEES

v.

RUSSIAN FEDERATION,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01996)

---

*David Riesenberg* argued the cause and filed the briefs for appellant.

*Steven M. Shepard* argued the cause and filed the brief for appellees. *Zachary Savage* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, WILKINS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

Concurring opinion filed by *Circuit Judge* WILKINS.

RAO, *Circuit Judge*: From 2003 to 2004, Russia expropriated the most valuable assets of OAO Yukos Oil Company ("Yukos"), at the time the largest private oil company in the Russian Federation. Shareholders of Yukos challenged the expropriation in arbitration and secured a $50 billion award, which they seek to enforce in federal court. Russia asserts that sovereign immunity bars the suit and that the arbitration exception to the Foreign Sovereign Immunities Act ("FSIA") does not apply. The district court held it had jurisdiction under the FSIA, in part because it was bound by the arbitral tribunal's conclusion that an arbitration agreement existed between Russia and the Shareholders.

Whether an arbitration agreement exists is a jurisdictional fact under the FSIA that must be independently evaluated by the district court. Because the district court gave binding effect to the arbitral tribunal's determination of this jurisdictional fact, we vacate the judgment. On remand, the district court must independently consider whether the FSIA's arbitration exception to sovereign immunity applies.

I.

The Yukos Shareholders are several companies organized under the laws of Cyprus and the Isle of Man: Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. In February 2005, the Shareholders initiated arbitration proceedings alleging that Russia expropriated Yukos's assets in violation of the Energy Charter Treaty ("Treaty").

Designed to promote international cooperation and investment in the energy sector, the Treaty generally prohibits signatory countries from expropriating investments held by investors from other signatories. *See* Energy Charter Treaty art.

13, Dec. 17, 1994, 2080 U.N.T.S. 95. If disagreements arise, investors may submit the dispute to arbitration. *Id.* art. 26(3)(a). The Treaty requires a country to comply with its terms from the moment of signature, even before the Treaty is ratified, "to the extent that such provisional application is not inconsistent with [the signatory's] constitution, laws or regulations." *Id.* art. 45(1). The Vice Prime Minister of Russia signed the Treaty on December 17, 1994, but the Russian Parliament never ratified it. Russia withdrew from the Treaty in 2009.

The arbitration proceedings between Russia and the Shareholders at The Hague lasted nearly a decade. Russia consented to the jurisdiction of the arbitral tribunal ("Tribunal") to determine arbitrability but maintained throughout the proceedings that the Tribunal lacked jurisdiction over the dispute. Russia argued it was not required to provisionally apply the arbitration clause of the Treaty because to do so would be inconsistent with Russian law. Russia also maintained the Shareholders were not investors within the meaning of the Treaty because the companies are controlled by Russian citizens and so do not qualify as investors from another state.

In November 2009, the Tribunal entered interim awards rejecting Russia's challenge to its jurisdiction. The Tribunal concluded that the Shareholders qualified as investors under the Treaty and that Russia had agreed to arbitrate because the arbitration clause applied provisionally in Russia at the time of the expropriation. The Tribunal issued final awards in July 2014, finding that Russia had violated the Treaty and awarding the Shareholders over $50 billion in damages.

Following the Tribunal's decision, the dispute continued, this time in the courts. Russia asked the Hague District Court (a national Dutch court) to set aside both the interim and final

4

awards. The Dutch Supreme Court ultimately held for the Shareholders on nearly all issues. It affirmed that the Tribunal had jurisdiction over the dispute, that provisional application of the arbitration clause was consistent with Russian law, and that the Shareholders were investors within the meaning of the Treaty.

While proceedings were pending in the Dutch courts, the Shareholders brought suit in the United States District Court for the District of Columbia to confirm and enforce the final awards. Russia moved to dismiss the Shareholders' enforcement suit for lack of subject matter jurisdiction. Russia asserted sovereign immunity and argued that none of the FSIA's exceptions to sovereign immunity applied. In particular, Russia maintained the arbitration exception did not apply because there was no valid arbitration agreement between Russia and the Shareholders. Russia offered the same arguments it raised before the Tribunal, namely that it was not required to provisionally apply the arbitration clause and that the Shareholders were not investors within the meaning of the Treaty because they were "mere shell companies owned and controlled by … [Russian] nationals."

After the Dutch Supreme Court's decision, the district court denied Russia's motion to dismiss. The court concluded it had subject matter jurisdiction because the FSIA's arbitration exception applied. *See Hulley Enters. Ltd. v. Russian Federation*, No. 14-cv-1996, 2023 WL 8005099, at \*12 (D.D.C. Nov. 17, 2023). The district court explained the "terms of the [Treaty]" demonstrated "the existence of an agreement to arbitrate." *Id.* at \*13. But if there were doubt as to this fact, the Tribunal's determination that an arbitration agreement existed between Russia and the Shareholders was "binding" on the court. *Id.* at \*16. The district court likewise treated as

5

binding the Tribunal's holding that Russia was required to apply the entire treaty provisionally. *Id.* at \*21.

Russia timely appealed. We have jurisdiction under the collateral order doctrine to review the denial of Russia's claim of sovereign immunity. *See Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 581 (D.C. Cir. 2020). We review the district court's jurisdictional determination de novo. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004).

II.

For the Shareholders to enforce these arbitral awards in United States courts, Russia "must not enjoy sovereign immunity from such an enforcement action."[1] *Creighton Ltd. v. Government of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). Foreign sovereigns are "presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping*

---

[1] To enforce an arbitration award in federal court against a foreign sovereign, there must also "be a basis upon which a court in the United States may enforce a foreign arbitral award." *Creighton Ltd. v. Government of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). Russia does not dispute that the New York Convention provides a basis for enforcing these arbitral awards. *See* 9 U.S.C. § 207; Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. I, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3; *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 n.2 (D.C. Cir. 2021) (recognizing the New York Convention provides a basis for enforcing arbitral awards in the federal courts).

*Corp.*, 488 U.S. 428, 443 (1989). Unless a plaintiff's case falls within one of the nine exceptions enumerated in the FSIA, the federal courts lack subject matter jurisdiction. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488–89 (1983).

The Shareholders maintain the FSIA's arbitration exception applies to this case. That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is brought, either to enforce an [arbitration] agreement made by the foreign state with or for the benefit of a private party … or to confirm an award made pursuant to such an agreement to arbitrate, if … the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6).

Before concluding the arbitration exception to sovereign immunity applies, a federal court must independently confirm three jurisdictional facts: (1) the existence of an arbitration agreement; (2) an arbitration award; and (3) a treaty that may govern the award. *See Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021). This Circuit applies a burden-shifting framework to evaluate whether jurisdiction has been established.[2] When asserting the

---

[2] The United States has repeatedly argued that this framework is incompatible with the jurisdictional nature of the FSIA. *See* Brief for the United States as Amicus Curiae at 9 n.2, *NextEra Energy Glob.*

arbitration exception applies, a plaintiff must initially satisfy "a burden of production" as to these facts. *Chevron*, 795 F.3d at 204 (cleaned up). The burden then shifts to the foreign sovereign to demonstrate "the absence of the factual basis by a preponderance of the evidence." *Id.* (cleaned up).

Jurisdictional questions must be independently analyzed by the court. *See generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (explaining "the court is bound to ask and answer for itself" the question of jurisdiction). Determining whether we have jurisdiction over a foreign sovereign under the FSIA is no exception. Accordingly, when faced with questions about sovereign immunity, we must independently "resolve any disputed issues of fact" relevant to jurisdiction. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Federal courts may not defer to an arbitral tribunal or otherwise outsource the obligation to determine jurisdictional facts that go to the waiver of sovereign immunity under the FSIA.

III.

On appeal, Russia maintains the district court erred in deferring to the Tribunal's conclusions about jurisdictional

---

*Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024) (arguing that because a foreign state is presumptively immune from suit, there is "no justification for placing the ultimate 'burden of persuasion' on the foreign state"); Brief for the United States as Amicus Curiae Supporting Petitioners at 10, *Republic of Hungary v. Simon*, 145 S. Ct. 480 (2025) ("The FSIA's text makes clear that sovereign immunity is jurisdictional, and the burden of establishing subject-matter jurisdiction always rests with the party asserting jurisdiction."). In *Republic of Hungary v. Simon*, the Supreme Court explicitly declined to reach this issue, thereby leaving our framework undisturbed. 145 S. Ct. 480, 490 n.1 (2025).

facts. Russia contends that it retains sovereign immunity because there was no valid arbitration agreement triggering a waiver of immunity under the FSIA.[3] Russia advances two primary arguments in support. First, Russia claims it did not make an offer to arbitrate because provisional application of the Treaty's arbitration clause would have been inconsistent with Russian law. Second, even if Russia were required to apply the arbitration clause provisionally such that it constituted a standing offer to arbitrate, the Shareholders were not investors within the meaning of the Treaty.

At the outset, we must evaluate whether Russia's arguments challenge the *existence* or *validity* of an arbitration agreement or instead merely challenge the *scope* of an arbitration agreement. When a party challenges the existence or validity of an arbitration agreement, that question goes to the applicability of an exception to sovereign immunity and therefore is jurisdictional. *See Belize Soc. Dev. Ltd. v. Government of Belize ("Belize")*, 794 F.3d 99, 102–03 (D.C. Cir. 2015) (treating as jurisdictional the question of whether a country's Prime Minister had authority to enter an arbitration agreement).

By contrast, questions about whether an arbitration agreement covers a particular investment pertain to the scope of the agreement and are not jurisdictional. *See Chevron*, 795 F.3d at 205–06 (holding that whether certain lawsuits were "investments" within the meaning of an arbitration agreement was not a jurisdictional question); *Stileks*, 985 F.3d at 878

---

[3] The other jurisdictional prerequisites are easily satisfied, as the district court held and the parties do not contest. The Tribunal awarded the Shareholders $50 billion in damages, and the awards are governed by the New York Convention. *See Creighton*, 181 F.3d at 123–24.

(holding that whether a foreign sovereign "agreed to arbitrate [a] *particular* dispute" was not jurisdictional). Arguments about scope are arguments about arbitrability. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). And when parties delegate questions of arbitrability to an arbitral tribunal, this court is bound by the tribunal's determinations. *See id.* at 528; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (explaining "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration"); *Stileks*, 985 F.3d at 878 (applying *First Options* in the FSIA context).

## A.

Russia first argues the Treaty was not an offer to arbitrate "with anybody or about anything." This argument challenges the existence of an arbitration agreement and therefore relates to the jurisdictional question of whether Russia has sovereign immunity for these claims. The district court was required to evaluate this argument independently and erred in giving binding effect to the determinations of the Tribunal on this question.

"[A]n arbitration provision in an investment treaty can … constitute an agreement for the benefit of a private party" that "operates as a unilateral offer to arbitrate" and may become an arbitration agreement with a private party when the private party accepts the offer. *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1101–02 (D.C. Cir. 2024) (cleaned up).

Russia maintains that it never made a standing offer to arbitrate. Because the Russian Parliament did not ratify the Treaty, Russia committed only to applying the Treaty provisionally. And the Treaty by its terms provides for provisional application only "to the extent that such provisional

application is not inconsistent with [the signatory's] constitution, laws or regulations." Treaty art. 45(1). Russia contends that its law does not permit arbitration of "public law disputes," including "most disputes involving the government" and "government contracts." As a result, Russia was not provisionally bound to the Treaty's arbitration clause.[4]

This argument pertains to our jurisdiction under the FSIA's arbitration exception to sovereign immunity. In this context, an arbitration agreement between Russia and the Shareholders would exist only if Russia had made a standing offer to arbitrate through provisional application of the Treaty. *See NextEra*, 112 F.4th at 1101–02. Russia denies it extended any such offer, because it was not required to apply the Treaty's arbitration clause provisionally. Russia's argument therefore goes to the existence of an arbitration agreement and is jurisdictional.[5]

Because the existence of an arbitration agreement is a jurisdictional fact under the FSIA, the district court was

---

[4] Russia also claims the Vice Prime Minister who signed the Treaty "lacked authority to enter the agreement to arbitrate without Parliament's approval" because "the text, purpose, and context" of the Treaty and "a detailed analysis of Russian judicial practice" demonstrate that provisional application of the arbitration clause is inconsistent with Russian law. This "lack of authority" framing is not an independent argument but merely another way of saying that Russia did not make a standing offer to arbitrate because it was not bound to provisionally apply the Treaty's arbitration clause.

[5] This is consistent with the general principle that when the formation of an arbitration agreement is contested, "the court must resolve the disagreement." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–300 (2010) (cleaned up).

required to decide Russia's claim de novo, without deferring to the Tribunal's conclusions about Russian law.

The district court declined to undertake this inquiry, concluding that it was bound to follow the Tribunal's determinations as to the existence of an arbitration agreement. In doing so, the district court mistakenly relied on the deferential standard applied to disputes over the *scope* of an arbitration agreement. *Hulley Enters.*, 2023 WL 8005099, at *21 n.20, *16 (citing *First Options*, 514 U.S. at 942–43; *Stileks*, 985 F.3d at 878–79). But in *Stileks*, the parties did not contest the existence of an arbitration agreement. Rather, the dispute was over arbitrability, which may be conclusively determined by an arbitral tribunal when the parties so delegate. 985 F.3d at 878. In *First Options*, the Supreme Court likewise addressed arbitrability, not the existence of an arbitration agreement. 514 U.S. at 943.

We reiterate that the existence of an arbitration agreement is a jurisdictional question under the FSIA that must be independently determined by the court. On remand, the district court must decide whether provisional application of the Treaty's arbitration clause is consistent with Russian law.

B.

Russia also argues that even if it did make a standing offer to arbitrate by signing the Treaty, the Shareholders are not proper beneficiaries of the arbitration clause. The arbitration clause provides for settlement of disputes "between a Contracting Party and an Investor of another Contracting Party." Treaty art. 26. Russia contends that the Shareholder companies, although formally organized under the laws of Cyprus and the Isle of Man, are controlled by Russian citizens and therefore are not investors "of another Contracting Party."

Unlike Russia's other argument, this one is not jurisdictional. Whether the Shareholders are investors within the meaning of the arbitration clause "is an argument regarding the *scope* of the Energy Charter Treaty, not its *existence*." *NextEra*, 112 F.4th at 1103. Our decision in *NextEra* squarely forecloses Russia's argument. In *Chevron*, we similarly rejected Ecuador's attempt to recharacterize as jurisdictional questions about whether certain claims were arbitrable. 795 F.3d at 205. And in *Stileks*, we held that a claim about which investments were covered by the treaty went to arbitrability, not jurisdiction. 985 F.3d at 878. Like the sovereigns' arguments in *Chevron* and *Stileks*, Russia's argument that the Shareholders do not qualify as investors within the meaning of the Treaty pertains to arbitrability and so is not jurisdictional, as the district court correctly held.[6]

\* \* \*

The district court was required to independently determine the jurisdictional facts regarding Russia's sovereign immunity and whether the FSIA's arbitration exception applies to allow the Shareholders' suit. On remand, the district court must assess whether provisional application of the Treaty's arbitration clause was consistent with Russian law.

IV.

The Shareholders also maintain this suit may go forward because the Dutch courts determined that Russia had agreed to arbitrate this dispute, and therefore issue preclusion bars Russia from relitigating the existence of an arbitration agreement. The

---

[6] Because this issue is not jurisdictional, the denial of jurisdictional discovery was not an abuse of discretion. *See Aljabri v. bin Salman*, 106 F.4th 1157, 1163 (D.C. Cir. 2024).

district court declined to address this argument because it had already deferred to the Tribunal's determination of this jurisdictional question.

Even on the required independent review of jurisdictional facts, the decisions of the Dutch courts may control the factual questions that the district court must answer. Given the numerous threshold issues necessary to resolve before giving preclusive effect to foreign judgments, it is appropriate to remand for the district court to address this issue in the first instance. We will, however, provide "some guidance for the task to be tackled on remand." *Doraleh Container Terminal SA v. Republic of Djibouti*, 109 F.4th 608, 617 (D.C. Cir. 2024) (cleaned up).

The first question the district court must consider is whether issue preclusion applies to jurisdictional questions under the FSIA. Issue preclusion is a judicial doctrine providing that a prior judgment may "foreclos[e] successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001). It is well established that, in general, "[i]ssue preclusion applies to threshold jurisdictional issues." *Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 41 (D.C Cir. 2015). And sovereign immunity is a jurisdictional issue. Other courts have given preclusive effect to jurisdictional determinations by domestic courts when analyzing subject matter jurisdiction under the FSIA.[7] This court has not

---

[7] *See Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759, 765–67 (9th Cir. 2007) (giving preclusive effect to a previous state court decision that the court lacked subject matter jurisdiction under the FSIA); *Biton v. Palestinian Interim Self-Government Auth.*, 412 F. Supp. 2d 1, 4–5 (D.D.C. 2005) (holding that "collateral estoppel preclude[d] re-litigation of the issue[]" of whether certain foreign organizations

previously addressed the issue and so the district court should evaluate whether issue preclusion applies in this context.

If the district court determines that issue preclusion applies to jurisdictional questions under the FSIA, it must also assess whether preclusion extends to *foreign* judgments. This, too, appears to be a novel question. We are aware of no case, and the parties point to no case, in which a court has given preclusive effect to a foreign judgment in order to exercise jurisdiction over a foreign sovereign under the FSIA. That said, United States courts have long accorded respect to, and often enforced, judgments of foreign courts. As Chief Justice Marshall explained, "[I]n the courts of England," the judgment "of a foreign court is conclusive with respect to what it professes to decide," so long as the court "has, in the given case, jurisdiction of the subject-matter." *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 270 (1808). The Supreme Court viewed the English approach "as the uniform practice of civilized nations" and adopted it. *Id.* at 271.

Later, in the seminal case *Hilton v. Guyot*, the Supreme Court explained that recognition of foreign judgments is a matter of international comity. 159 U.S. 113, 163–67 (1895). And the Court set forth a series of factors for determining whether such recognition is appropriate in a particular case. *Id.* at 202–03. Since *Hilton*, the federal courts have extended comity to foreign judgments that comport with the standard expounded by the Court. *See Tahan v. Hodgson*, 662 F.2d 862,

---

"[met] the definition of 'foreign state' under the [FSIA]," and were therefore immune from suit, because the issue had been "fully and carefully examined" by two other domestic courts); *Mortimer Off Shore Servs., Ltd. v. Federal Republic of Germany*, No. 10-cv-11551, 2012 WL 1067648, at \*10–11 (D. Mass. Mar. 28, 2012) (giving preclusive effect to the Second Circuit's decision that the dispute did not fall within the commercial exception to the FSIA).

864–68 (D.C. Cir. 1981) (applying the *Hilton* factors and concluding that enforcement of an Israeli judgment was required); *Donnelly v. FAA*, 411 F.3d 267, 270–71 (D.C. Cir. 2005) (upholding, as consistent with *Hilton*, a federal agency's use of a foreign criminal conviction as evidence in an adjudication)*; see also Phillips USA v. Allflex USA, Inc.*, 77 F.3d 354, 359–61 (10th Cir. 1996); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 456–60 (2d Cir. 1985); *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 34–36 (D.D.C. 2007).

If issue preclusion applies to jurisdictional facts under the FSIA, the district court must apply the *Hilton* factors to determine whether principles of comity counsel in favor of recognizing the Dutch judgments. *See Tahan*, 662 F.2d at 864 (explaining *Hilton*'s relevance for the enforcement of foreign judgments). The court should also consider how the *Hilton* factors intersect with the ordinary standard for assessing collateral estoppel. *See, e.g.*, *Hurst*, 474 F. Supp. 2d at 33–34 (analyzing whether a foreign judgment met the *Hilton* factors and the ordinary collateral estoppel standard); *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325–32 (S.D.N.Y. 1997) (applying the *Hilton* comity factors and issue preclusion standards sequentially). The parties dispute whether the elements of issue preclusion are met here, in particular whether the Dutch proceedings were "full and fair." *See Hilton*, 159 U.S. at 202. We leave these questions for the district court to consider in the first instance.

Whether to apply issue preclusion to foreign judgments with respect to determinations of foreign sovereign immunity is a novel question that may implicate foreign relations and international law. Accordingly, the district court should invite the United States to express the government's position on this

issue, through a Statement of Interest pursuant to 28 U.S.C. § 517, or any other appropriate mechanism.

\* \* \*

For the foregoing reasons, we vacate the judgment and remand for the district court to determine whether Russia is entitled to sovereign immunity or if the arbitration exception to the FSIA applies. In making this jurisdictional determination, the district court should also consider whether the Dutch courts' judgments on this question are entitled to preclusive effect.

*So ordered.*

WILKINS, *Circuit Judge*, concurring:

I join in full the Court's opinion. I write separately to emphasize the limits of our decision. We do not hold that every time a sovereign claims it lacked authority or capacity to agree to arbitrate, it necessarily raises a jurisdictional attack under the Foreign Sovereign Immunities Act. Not all such arguments are jurisdictional. *Compare* Brief for Appellant at 40, *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024) (Nos. 23-7031, 23-7032), Dkt. No. 2011894 (claiming a "lack[]" of "capacity" to agree to arbitrate), *with NextEra*, 112 F.4th at 1103 (determining the argument went to the agreement's scope and not its existence). Rather, Russia's specific argument here, given the text of Article 45 of the Treaty and the basis Russia identifies for limiting its provisional application of the Treaty, plainly goes to the existence of any arbitration agreement. District Courts should carefully consider the justification for any "lack of authority" claim, along with the details of the contested arbitration agreement, in resolving these jurisdictional disputes.